```
 1                UNITED STATES DISTRICT COURT

 2          FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3                      EASTERN DIVISION

 4   - - - - - - - - - - - - - X

 5   UNITED STATES OF AMERICA,    :

 6        Plaintiff,              :

 7           v.                   :  No.

 8   CALIFORNIA STEM CELL         :  5:18-CV-01005-JBG-KKx

 9   TREATMENT CENTER, IND.,      :

10        Defendants.             :

11   - - - - - - - - - - - - - X

12                              Washington, D.C.

13                              Friday, June 7, 2019

14           Deposition of LOLA M. REID, Ph.D., a

15   witness herein, called for examination by counsel for

16   Plaintiff in the above-entitled matter, pursuant to

17   notice, the witness being duly sworn by MARY GRACE

18   CASTLEBERRY, a Notary Public in and for the District

19   of Columbia, taken at the offices of United States

20   Department of Justice, 450 Fifth Street, N.W.,

21   Washington, D.C., at 10:02 a.m., Friday, June 7,

22   2019, and the proceedings being taken down by
```

1   Stenotype by MARY GRACE CASTLEBERRY, RPR, and

2   transcribed under her direction.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

```
 1    APPEARANCES:

 2

 3       On behalf of the Plaintiff:

 4            NATALIE N. SANDERS, ESQ.

 5            United States Department of Justice

 6            455 Fifth Street, N.W.

 7            Washington, D.C.   20001

 8            (202) 598-2208

 9               and

10            MICHAEL D. HELBING, ESQ.

11            Associate Chief Counsel

12            MICHAEL SHANE, ESQ.

13            Associate Chief Counsel

14            PERHAM GORJI, FDA

15            Deputy Chief Counsel for Litigation

16            U.S. Department of Health and Human

17             Services

18            10903 New Hampshire Avenue

19            Silver Spring MD   20993

20            (240) 402-6165

21

22
```

```
 1    APPEARANCES (Continued):

 2

 3        On behalf of the Defendants:

 4             MARY M. GARDNER, ESQ.

 5             Venable LLP

 6             600 Massachusetts Avenue, N.W.

 7             Washington, D.C.  20001

 8             (202) 344-4398

 9

10        ALSO PRESENT:

11             KRISTEN CANALES, Intern

12

13

14

15

16

17

18

19

20

21

22
```

```
 1   it.
 2        Q.    I'm just trying to figure out, are you
 3   referring to the same thing you told us at the
 4   beginning, which is last night you downloaded some
 5   information from the FDA's website for the first
 6   time, correct?
 7        A.    Correct.  That is correct.
 8        Q.    And it's your understanding that
 9   definitions that speak to which products would
10   require an IND or an NDA, that that can be found in
11   some of the materials you downloaded for the first
12   time last night?
13        A.    Correct.
14        Q.    And had you consulted any rules or laws
15   addressing this point at any time before last night?
16        A.    Yes.  I talked with Steven Rhodes, who is
17   a regulatory agent actually working at the FDA, and
18   this is like six months ago, as we're beginning this
19   whole process of transitioning to what we hope will
20   be clinical trials in the coming year.  And he was
21   explaining to me about that we're going to have to go
22   through a more complicated route of getting approval
```

1    than other people who are doing cell therapies where

2    there are simpler protocols because we're making

3    these grafts.  And so he -- I mean, I talked with him

4    on a couple of occasions, but it had nothing to do

5    with what we're talking about here.  It had to do

6    with what we're hoping to do in a year or two.

7         Q.    Well, let's turn now to what we're talking

8    about here, which is adipose-derived stromal vascular

9    fraction.  Why do you believe that no FDA approvals

10   are necessary for stromal vascular fraction?

11              MS. GARDNER:  Objection.  It

12   mischaracterizes the report.

13   BY MS. SANDERS:

14        Q.    Let me ask this.  You spoke about

15   composite articles or products that you believe need

16   to go through the IND or NDA process.

17        A.    Correct.

18        Q.    And you contrasted that with the kinds of

19   stromal vascular fraction products that are at issue

20   in this case.  And I'm simply trying to understand

21   what the basis for your distinction is.  Why do you

22   believe that no FDA approval is needed for the

 1   stromal vascular fraction articles?
 2             MS. GARDNER:  Objection.  Vague.  Are you
 3   talking about the defendants' article?
 4             MS. SANDERS:  I'm first talking in
 5   general.
 6   BY MS. SANDERS:
 7        Q.   I'm asking is your --
 8             MS. GARDNER:  Objection.  Mischaracterizes
 9   her testimony.
10   BY MS. SANDERS:
11        Q.   Well, let me --
12        A.   I can actually answer it pretty easily,
13   okay?  I think there are times when the FDA will have
14   to be involved, but I think at its simplest, taking
15   cells out, if you use really purified conditions like
16   purified collagenase, you can isolate cells that are
17   essentially like they are in vivo and giving them
18   back in another site is a perfectly safe procedure.
19   It's like taking blood samples from a patient and
20   giving them back to another patient.
21             But I distinguish that from doing things
22   like culturing them or adding another product to them

 1    like a virus.  There I don't agree.  I think there

 2    you really have to do your homework and know whether

 3    they're safe to give.  But just to take them out and

 4    re-isolate cells all the time from tissues, from

 5    solid tissues and with the most minimal procedures

 6    that we use, you should be able to give those cells

 7    back because you haven't done anything to harm them.

 8                Obviously you have to be careful what you

 9    use, what enzymes you use.  They have to be very

10    pure.  And you can't use certain ones that are known

11    to harm the antigenicity of the cells.  But to take

12    the cells out, do a very simple procedure,

13    immunoselect them by magnet beads or there are some

14    other panning methods that can be used for it.  Those

15    are very simple and then those cells can be given

16    back.  And you've done nothing to harm those cells,

17    all right?

18                And the fortunate thing is that the

19    stromal vascular fraction contains cells that have

20    paracrine signals that indeed can suppress chronic

21    inflammation.  And I think it's going to be wonderful

22    for people, for at least certain forms of disease

1  states, that those should be allowed.

2          Anything that starts with that, but then

3  does some modifications, I think you've got to have

4  to worry about what you're going to be doing.  But

5  just the simple thing of getting out a cell,

6  isolating it and giving it back to that patient

7  should be perfectly safe.

8     Q.   If I heard you correctly, adding a vaccine

9  to a collection of cells is something that you think

10 does require FDA approval, correct?

11    A.   It is.  I do.

12    Q.   And you would also agree that expanding

13 stromal vascular fraction cells is also something

14 that requires FDA approval, correct?

15         MS. GARDNER:  Objection.  Calls for a

16 legal conclusion.

17         MS. SANDERS:  I'm asking her for her

18 opinion.  I'm not asking her to give a legal opinion.

19 BY MS. SANDERS:

20    Q.   I just want your scientific, informed

21 judgment.

22    A.   I'm an expert in the whole ex vivo

1  maintenance of cells and so there it would be a

2  qualified answer because depending on exactly how you

3  did it, you could alter the cells in a way that would

4  not be good.  But you can maintain them ex vivo in

5  certain forms where it's safe for a narrow window of

6  time.  But the longer you have them ex vivo, they are

7  changing.  And then increasingly you're getting to

8  the point where you're going to have to then really

9  do your homework, all right?

10             So the ones that I think -- the simplest

11  are you take them out, you fish them out with

12  extremely pure enzymes and you have a subpopulation

13  that you're choosing, those should be able to be

14  given back, all right?  Without problems.

15       Q.   So let me address the two points you made.

16  With respect to cells that are expanded in culture,

17  for clarity, you think there are instances where FDA

18  approval should be obtained, correct?

19       A.   For some of them.

20       Q.   But for some you would say FDA approval is

21  not required, correct?

22       A.   Yes.  It's --

```
 1      Q.    Now, for --

 2      A.    Yes.

 3      Q.    -- the stromal vascular fraction article

 4   that defendants use in this case, it's your opinion

 5   that FDA approval is not required at any time,

 6   correct?

 7            MS. GARDNER:  Objection.  Vague.

 8            THE WITNESS:  No.  I've already told you I

 9   don't agree with that.  I said that to fish out the

10   cells, to use a super pure collagenase or one of the

11   Liberase versions which are enzyme mixes that are

12   very pure, those cells should be able to be given

13   back.

14            So if it is autologous cell therapy,

15   you're giving them back to the same patient.  You're

16   not doing expansion -- even expansion theoretically

17   could indeed be perfectly safe, but there I'm

18   hesitant to give carte blanche on that because it

19   depends on what you do.  But just to get them out, to

20   fish them back and then to give them back, I think,

21   is perfectly safe.

22   BY MS. SANDERS:
```

 1      Q.   Isn't it true, Dr. Reid, that scientists,

 2   researchers, doctors in fields have differing views

 3   on the things that you've been discussing in your

 4   most recent answer?

 5           Or let me say it this way.  You think that

 6   stromal vascular fraction cells that should be -- let

 7   me rephrase.

 8           If I understood you correctly, the

 9   combination of stromal vascular fraction cells with a

10   vaccine is something that should require FDA

11   approval.  Isn't it true that there are scientists

12   and perhaps other researchers who may share a

13   different view on that question?

14      A.   I think -- I'm sure they do.  But there is

15   one where -- I have enough knowledge about the

16   viruses -- and when you put viruses in there, then

17   there are many things that can happen.  So I would

18   be --

19      Q.   Fair enough.

20      A.   -- nervous about doing that.

21      Q.   Sure.  So where would we look to resolve

22   the question?  Someone says FDA approval is required.

1    Someone else doesn't want to seek FDA approval.  Are
2    you aware of a source that answers that question?
3        A.   Actually, the patients answer it.  Gosh,
4    think about all the decades we've done blood -- taken
5    blood samples and we've fractionated them and you put
6    the patients through dialysis and you're
7    fractionating the cells in one way or another and
8    you're giving them back.
9             So how do you know -- at what point do you
10   say, okay, there's going to have to be more work
11   done.  If you start getting a percentage of patients
12   who are having some type of aberration because of
13   what you're doing, that says, okay, we've got to back
14   up here and figure out what's going on.  But when
15   they're giving T cells or B cells or platelets or
16   erythrocytes, to my knowledge, they don't require FDA
17   approval for that.
18       Q.   And what is your knowledge based on?
19       A.   This is just by associates who are
20   hematologists.
21       Q.   So something that someone has told you who
22   has studied hematology, that's the source of your

1  knowledge?

2      A.   Yes.

3      Q.   And it's your opinion that experimental

4  treatments should be permitted and to the extent that

5  there are problems, that will be cleaned up on the

6  back end; is that --

7      A.   No, not at all.  No.  But right now there

8  are a number of types of procedures that are done

9  that now are not -- to my knowledge are not regulated

10 by the FDA and most of them have to do with

11 hemopoietic cells.  But hemopoietic cells are ones

12 that have evolved over the millennia to float.  So

13 they have cell binding domains, they have isoforms in

14 which they can switch between having cell binding

15 domains and not having cell binding domains.

16          And the fact that there are phases where

17 they don't have cell binding domains means that

18 fractionation of them is much, much easier.  And so

19 there are ways by size, by sieving, by

20 immunoselection with antibodies that you can fish out

21 a particular population and then they give them back

22 to the patient in one form or another.

```
 1      Q.    I see.  Are you familiar with the Federal
 2   Food, Drug and Cosmetic Act?
 3      A.    I know of it.  I have no knowledge --
 4   detailed knowledge of it at all.
 5      Q.    Are you familiar with the Public Health
 6   Service Act?
 7      A.    I know of it, but I don't know the
 8   details.
 9      Q.    Are you familiar with various regulations
10   that govern drugs in Title 21 of the Code of Federal
11   Regulations?
12      A.    I have no idea.
13      Q.    What's a drug?
14      A.    Well, a drug is a chemical that can be
15   delivered to a patient by some route and has an
16   alteration in the biological properties and the
17   phenotypic traits of the cells.
18      Q.    Are you aware, Dr. Reid, that there is a
19   legal definition of a drug?
20      A.    I'm sure there is, but I don't know what
21   it is.
22      Q.    Do you know where you would look to find
```

```
 1              CERTIFICATE OF REPORTER
 2  UNITED STATES OF AMERICA ) ss.:
 3  DISTRICT OF COLUMBIA     )
 4        I, MARY GRACE CASTLEBERRY, RPR, the officer before whom
 5  the foregoing proceedings were taken, do hereby
 6  certify that the foregoing transcript is a true and
 7  correct record of the proceedings; that said
 8  proceedings were taken by me stenographically to the
 9  best of my ability and thereafter reduced to
10  typewriting under my supervision; and that I am
11  neither counsel for, related to, nor employed by any
12  of the parties to this case and have no interest,
13  financial or otherwise, in its outcome.
14
15
16  _____
17            Notary Public in and for
18            The District of Columbia
19
20  My commission expires:  July 14, 2021
```