BRIAN M. BOYNTON
Acting Assistant Attorney General
GUSTAV W. EYLER
Director
Consumer Protection Branch
NATALIE N. SANDERS
ROGER J. GURAL
Trial Attorneys
      Consumer Protection Branch
      U.S. Department of Justice
            450 5th Street, NW, Suite 6400-South
            Washington, D.C. 20530
            Telephone: (202) 598-2208
            Facsimile:  (202) 514-8742
            E-mail: Natalie.N.Sanders@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>      v.<br><br>CALIFORNIA STEM CELL TREATMENT CENTER, INC., *et al.*<br><br>      Defendants. | No. 5:18-CV-01005-JGB-KKx<br><br>**PLAINTIFF'S TRIAL BRIEF**<br><br>Trial:       May 4, 2021<br>Time:      9:00 a.m.<br>Courtroom:  Riverside Courthouse<br>              3470 Twelfth Street<br>              Riverside, CA 92501<br>              Courtroom 1, 2nd Floor<br><br>Hon. Jesus G. Bernal |

# **<u>TABLE OF CONTENTS</u>**

TABLE OF AUTHORITIES ......................................................................iii

I.     CLAIMS AND DEFENSES [Local Rule 16-4.1(a-g)] ............................1

     A.     Summary Statement of the Government's Claims.........................3

     B.     Elements Required to Establish the Government's Claims ..........3

         1.     Elements of 21 U.S.C. §331(k) Violation (Adulteration)..................3

         2.     Elements of 21 U.S.C. §331(k) Violation (Misbranding) .................3

         3.     Elements of Receiving Misbranded Drugs in Interstate Commerce and Delivering or Proffering Them for Pay or Otherwise under 21 U.S.C. § 331(c)......................................4

     C.     The Government's Key Evidence in Support of Each Claim ......4

         1.     The CSCTC Products are Drugs.........................................4

         2.     The CSCTC Products are Held for Sale After Shipment in Interstate Commerce ......................................................5

         3.     Evidence of Adulteration Supporting Violation of § 331(k)..............7

         4.     Evidence of Misbranding Supporting Violation of § 331(k)..............7

         5.     Evidence that Defendants Received Misbranded Drugs in Interstate Commerce and Delivered Them for Pay or Otherwise under § 331(c) ......................................................8

     D.     Defendants' "Lack of Adequate Notice" Defense ........................8

     E.     No Third Parties .................................................................9

II.     EVIDENTIARY ISSUES [Local Rule 16-4.1(h)] ................................9

III.     ISSUES OF LAW [Local Rule 16-4.1(i)] .............................................9

     A.     Defendants' CSCTC products are subject to the FDCA and its implementing regulations as drugs.........................................9

     B.     Defendants' CSCTC products also are subject to the PHSA and its implementing Part 1271 regulations as biological products and HCT/Ps. .............................................................10

     C.     Defendants' CSCTC products are adulterated and misbranded drugs in violation of the FDCA...........................................12

     D.     Defendants should be enjoined from further violations of the FDCA........13

i

IV.    BIFURCATION OF ISSUES [Local Rule 16-4.3] .................................. 14

V.    TRIAL [Local Rule 16-4.4] ...................................................................... 14

VI.    ATTORNEY'S FEES [Local Rule 16-4.5] ............................................. 14

VII.    ABANDONMENT OF ISSUES [Local Rule 16-4.6] ............................... 14

VIII.    REPLY TO DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW [Local Rule 16-10] .................................................... 14

    A.    The FDCA Applies to Defendants and Their Products .............................. 15

    B.    Defendants' Establishments Do Not Qualify for the "Same Surgical Procedure Exception" to the Requirements of 21 C.F.R. Part 1271 ........... 16

    C.    This Enforcement Action Satisfies the Constitution and the FDCA's Interstate Commerce Requirement. ........................................................... 22

# **TABLE OF AUTHORITIES**

## **CASES**

*Abigail Alliance v. von Eschenbach,*
495 F.3d 695 (D.C. Cir. 2007) ............................................................................ 24

*Action on Smoking & Health v. Harris,*
655 F.2d 236 (D.C. Cir. 1980) .............................................................................. 4

*Baker v. United States,*
932 F.2d 813 (9th Cir. 1991) ..................................................................... 4, 6, 23

*Bennett v. Spear,*
520 U.S. 154 (1997) ............................................................................................... 9

*Camp v. Pitts,*
411 U.S. 138 (1973) ............................................................................................... 9

*Citizens to Preserve Overton Park v. Volpe,*
401 U.S. 402 (1971) ............................................................................................... 9

*Fagan v. AmerisourceBergen Corp.,*
356 F. Supp. 2d 198 (E.D.N.Y. 2004) ................................................................. 4

*Fed. Trade Comm'n v. Morton Salt Co.,*
334 U.S. 37 (1948) ............................................................................................... 11

*Fla. Power & Light Co. v. Lorion,*
470 U.S. 729 (1985) ............................................................................................... 9

*Gonzales v. Raich,*
545 U.S. 1 (2005) ................................................................................................. 23

*Harry C. Crooker & Sons, Inc. v. Occupational Safety and Health Review Comm'n,*
537 F.3d 79 (1st Cir. 2008) ................................................................................. 11

*Kisor v. Wilkie,*
139 S. Ct. 2400 (2019) ................................................................................... 12, 19

*Med. Ctr. Pharmacy v. Mukasey,*

    536 F.3d 383 (5th Cir. 2008) ...................................................................... 15

*Pauley v. BethEnergy Mines, Inc.,*

    501 U.S. 680 (1991) .................................................................................... 19

*Thomas Jefferson Univ. v. Shalala,*

    512 U.S. 504 (1994) .................................................................................... 19

*United States v. 62 Packages, More or Less, of Marmola Prescription Tablets,*

    142 F.2d 107 (7th Cir. 1944) ........................................................................ 8

*United States v. Bob Lawrence Realty, Inc.,*

    474 F.2d 115 (5th Cir 1973) ...................................................................... 24

*United States v. Bowen,*

    100 U.S. (10 Otto) 508 (1879) ................................................................... 19

*United States v. Chung's Prods. LP,*

    941 F. Supp. 2d 770 (S.D. Tex. 2013) ......................................................... 6

*United States v. Dianovin Pharms., Inc.,*

    475 F.2d 100 (1st Cir. 1973) ....................................................................... 6

*United States v. Evers,*

    643 F.2d 1043 (5th Cir. 1981) ......................................................... 4, 6, 15

*United States v. First City Nat'l Bank of Houston,*

    386 U.S. 361 (1967) .................................................................................... 11

*United States v. Five Articles of Drug, ACAM2000, Vaccinia Vaccine, Live,*

    2018 WL 6318834 (C.D. Cal Jan. 30, 2018) ............................................ 25

*United States v. Kaplan,*

    836 F.3d 1199 (9th Cir. 2016) .............................................................. 6, 15

*United States v. Lane Labs-USA, Inc.,*

    324 F. Supp. 2d 547 (D.N.J. 2004) ............................................................. 4

*United States v. Loran Med. Sys., Inc.,*

iv

25 F. Supp. 2d 1082 (C.D. Cal. 1997) ...................................................... 15

*United States v. Odessa Union Warehouse Co-op*,

833 F.2d 172 (9th Cir. 1987) ................................................................ 24

*United States v. Regenerative Scis., LLC*,

741 F.3d 1314 (D.C. Cir. 2014) ...................................................... passim

*United States v. Regenerative Scis., LLC*,

878 F. Supp. 2d 248 (D.D.C. 2012) ....................................................... 19

*United States v. Rhody Dairy, LLC*,

812 F. Supp. 2d 1239 (W.D. Wash. 2011) ............................................. 3, 4

*United States v. Rutherford*,

442 U.S. 544 (1979) ............................................................................. 24

*United States v. Sene X Eleemosynary Corp. Inc.*,

479 F. Supp. 970 (S.D. Fla. 1979) ......................................................... 24

*United States v. US Stem Cell Clinic, LLC*,

403 F. Supp. 3d 1279 (S.D. Fla. 2019) ............................................. passim

*United States v. W.T. Grant Co.*,

345 U.S. 629 (1953) ........................................................................ 24, 25

*Whitaker v. Thompson*,

353 F.3d 947 (D.C. Cir. 2004) ............................................................... 16

## **STATUTES**

5 U.S.C. § 704 ........................................................................................ 9

5 U.S.C. § 706(2) .................................................................................... 9

21 U.S.C. § 321(g)(1)(B) ................................................................. 4, 9, 15

21 U.S.C. § 321(g)(1)(C) ................................................................. 4, 9, 15

21 U.S.C. § 321(g)(1)(D) ........................................................... 4, 6, 9, 23

21 U.S.C. § 321(p)(1) ........................................................................... 10

21 U.S.C. § 321(p)(2) ........................................................................... 10

21 U.S.C. § 331(c) ...................................................................................passim

21 U.S.C. §331(k) ....................................................................................passim

21 U.S.C. § 332(a) ....................................................................................13, 14

21 U.S.C. § 351(a)(2)(B) .................................................................2, 3, 12, 13

21 U.S.C. § 352(f)(1) ...............................................................................passim

21 U.S.C. § 352(j) ....................................................................................passim

21 U.S.C. § 353(b)(1) ........................................................................................2

21 U.S.C. § 353(b)(1)(A) ................................................................................10

21 U.S.C. § 353(b)(4) ..............................................................................passim

21 U.S.C. § 355 .................................................................................................2

21 U.S.C. § 379a ..............................................................................................6

42 U.S.C. § 262 ..............................................................................................12

42 U.S.C. § 262(i) .....................................................................................10, 16

42 U.S.C. § 264 ..............................................................................................17

**REGULATIONS**

21 C.F.R. Part 1271.........................................................................11, 16, 18

21 C.F.R. §1271.10(a)(3) ...............................................................................11

21 C.F.R. § 201.128 ...............................................................................4, 9, 16

21 C.F.R. § 201.5 .............................................................................................8

21 C.F.R. § 210.3(b)(3) ..................................................................................23

21 C.F.R. § 1271.10 .................................................................................17, 11

21 C.F.R. § 1271.10(a) ...................................................................................11

21 C.F.R. § 1271.10(a)(1) ..............................................................................11

21 C.F.R. § 1271.10(a)(2) ..............................................................................11

21 C.F.R. § 1271.10(a)(3) ..............................................................................11

21 C.F.R. § 1271.1(a) .....................................................................................17

21 C.F.R. § 1271.1(b) .....................................................................................17

21 C.F.R. § 1271.1(c) ................................................................................... 17

21 C.F.R. § 1271.15 ..................................................................................... 11

21 C.F.R. § 1271.15(a)-(e) .......................................................................... 17

21 C.F.R. § 1271.15(b) .........................................................................passim

21 C.F.R. § 1271.20 ...................................................................... 5, 12, 17

21 C.F.R. § 1271.3(c) ................................................................................... 11

21 C.F.R. § 1271.3(d) ............................................................................. 10, 18

21 C.F.R. § 1271.3(e) ............................................................................. 16, 21

21 C.F.R. § 1271.3(f) ................................................................................... 11

62 Fed. Reg. 9721 (Mar. 4, 1997) ............................................................... 20

63 Fed. Reg. 26744 (May 14, 1998) ............................................................ 20

66 Fed. Reg. 5447 (Jan. 19, 2001) .............................................................. 21

66 Fed. Reg. 5449 (Jan. 19, 2001) ................................................................ 5

66 Fed. Reg. 5456 (Jan. 19, 2001) ................................................................ 5

81 Fed. Reg. 23661 (April 22, 2016) .......................................................... 22

## OTHER REFERENCES

Food & Drug Admin., Proposed Approach to Regulation of Cellular and Tissue-Based
Products, FDA Dkt. No. 97N-0068 (Feb. 28, 1997),
https://www.fda.gov/media/70704/download ................................................ 20

Food & Drug Admin., Same Surgical Procedure Exception under 21 CFR
1271.15(b): Questions and Answers Regarding the Scope of the Exception;
Guidance for Industry, November 2017
("SSPE Final Guidance") ............................................................................. 21

Food & Drug Admin., Same Surgical Procedure Exception under 21 CFR
1271.15(b): Questions and Answers Regarding the Scope of the Exception; Draft
Guidance for Industry, October 2014 ("SSPE Draft Guidance") ..................... 21

Am. CryoStem Corp. (Food & Drug Admin. Jan. 3, 2018) Warning Letter,
https://www.fda.gov/inspections-compliance-
enforcement-and-criminal-investigations/warning-letters/american-cryostem-

corporation-535041-01032018 ........................................................................25

*Part 15 Hearing: Draft Guidances Relating to the Regulation of Human Cells, Tissues, or Cellular or Tissue-based Products* 148-153 (Sept. 12, 2016), https://www.fda.gov/downloads/BiologicsBloodVaccines/NewsEvents/Workshops MeetingsConferences/UCM532350.pdf ..............................................................22

Pursuant to Local Rule 16-10 and the Court's Civil Trial Scheduling Order (ECF No. 30), Plaintiff United States of America submits this Trial Brief that updates its previously filed Memorandum of Contentions of Fact and Law (ECF No. 112) and replies to Defendants' Memorandum of Contentions of Fact and Law (ECF No. 108) ("Defs.' Contentions").

## I.   CLAIMS AND DEFENSES [Local Rule 16-4.1(a-g)]

The Government brought this action to stop California Stem Cell Treatment Center, Inc. ("CSCTC"), Cell Surgical Network Corporation, Elliot B. Lander, M.D., and Mark Berman, M.D. (collectively, "Defendants"), from violating the law and endangering patients.  Defendants manufacture unproven, experimental drugs and administer them to patients, purportedly to treat a wide range of diseases and conditions, such as cancer, arthritis, macular degeneration, and stroke.  These drugs—which Defendants concede are "biologic product[s]"—are not licensed or approved by the U.S. Food and Drug Administration ("FDA") for *any* use, let alone for the litany of uses for which Defendants market them.

To make these drugs, Defendants remove adipose tissue (*i.e.*, fat) from a patient and, without FDA license or approval, process that tissue purportedly to isolate cellular components known as stromal vascular fraction ("SVF").  Defendants combine the SVF with another drug component such as saline (together, the "SVF product") and subsequently provide it to patients intravenously, through injections into different parts of a patient's body, or through inhalation using a nebulizer.  Another of Defendants' drugs combined SVF with a live smallpox vaccine (collectively, the "SVF/Vaccinia product") and injected it into patients with advanced-stage cancers.  A third drug purportedly contained SVF that had been grown in culture by a third-party laboratory (the "expanded SVF product").

Defendants and their drug products—including the SVF product, the SVF/Vaccinia product, and the expanded SVF product (collectively, the "CSCTC products")—violate the Federal Food, Drug, and Cosmetic Act ("FDCA") in two basic ways.  First, it is illegal

1

to manufacture and sell drugs that are produced without adherence to FDA's current good manufacturing practice ("CGMP") requirements. Such drugs are adulterated. *See* 21 U.S.C. § 351(a)(2)(B). Because the evidence shows that Defendants' CSCTC products are not manufactured, processed, packed, or held in compliance with CGMP, they are adulterated.

Second, it is illegal to manufacture and sell drugs that lack appropriate labeling or that pose a danger to health when used as intended. Such drugs are misbranded. Defendants' CSCTC products are misbranded under 21 U.S.C. § 352(f)(1) because their labeling does not bear adequate directions for use and lacks critical required information, such as indications for use, dosages, and routes of administration. The CSCTC products are also misbranded under 21 U.S.C. § 353(b)(4) because they are prescription drugs[1] and their labels do not bear the "Rx Only" symbol. Defendants' SVF/Vaccinia product is further misbranded under 21 U.S.C. § 352(j) because the manner in which it is used makes it dangerous to health.

Defendants claim that the CSCTC products address patients' symptoms of neurological, autoimmune, orthopedic, and degenerative diseases and conditions, which makes them "drugs" under the FDCA. Defendants admit the CSCTC products do not comply with CGMP, which makes them adulterated. They also admit the relevant facts regarding CSCTC product labeling, which makes them misbranded. But rather than comply with the law, Defendants misinterpret multiple FDA regulatory provisions to argue that the FDCA's basic legal requirements do not apply to them and their unapproved, experimental drugs. In particular, Defendants claim that the same surgical procedure ("SSP") exception at 21 C.F.R. § 1271.15(b) allows them to manufacture and label the

---

[1] A prescription drug is a drug intended for use by man which, because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, is not safe for use except under the supervision of a practitioner licensed by law to administer such drug; or a drug limited by an approved application under Section 505 of the Act (21 U.S.C. § 355) for use under the professional supervision of a practitioner licensed by law to administer such drug. *See* 21 U.S.C. § 353(b)(1).

CSCTC products without any FDA oversight. Defendants are wrong, and an injunction is necessary to prevent the Defendants' continued dangerous experimentation that puts patients—and the public health—at risk.

## A.    Summary Statement of the Government's Claims

**Claim No. 1:** Defendants violate 21 U.S.C. § 331(k) by causing the adulteration of drug products within the meaning of 21 U.S.C. § 351(a)(2)(B), while they are held for sale after shipment of one or more of their components in interstate commerce.

**Claim No. 2:** Defendants violate 21 U.S.C. § 331(k) by causing the misbranding of drug products within the meaning of 21 U.S.C. §§ 352(f)(1), 352(j), and 353(b)(4), while they are held for sale after shipment of one or more of their components in interstate commerce.

**Claim No. 3:** Defendants violate 21 U.S.C. § 331(c) by receiving drugs (or a component thereof) that are misbranded within the meaning of 21 U.S.C. §§ 352(f)(1) and 353(b)(4) in interstate commerce and delivering them or proffering them for delivery for pay or otherwise.

## B.    Elements Required to Establish the Government's Claims

### 1.    Elements of 21 U.S.C. § 331(k) Violation (Adulteration)

To prove adulteration under 21 U.S.C. § 331(k), the Government must show that: (1) the CSCTC product is a drug; (2) the CSCTC product was held for sale after the CSCTC product or a component thereof had moved in interstate commerce; and (3) Defendants performed, or caused to be performed, one or more acts which resulted in the CSCTC product being adulterated (such as failing to comply with CGMP). *See United States v. Rhody Dairy, LLC*, 812 F. Supp. 2d 1239, 1243 (W.D. Wash. 2011) (citation omitted).

### 2.    Elements of 21 U.S.C. § 331(k) Violation (Misbranding)

To prove misbranding under 21 U.S.C. § 331(k), the Government must show that: (1) the CSCTC product is a drug; (2) the CSCTC product was held for sale after the CSCTC product or a component thereof had moved in interstate commerce; and (3)

Defendants performed, or caused to be performed, one or more acts which resulted in the CSCTC product being misbranded.  *Id*.; *see also Baker v. United States*, 932 F.2d 813, 814 (9th Cir. 1991); *United States v. Regenerative Scis., LLC*, 741 F.3d 1314, 1323-24 (D.C. Cir. 2014); *United States v. Evers*, 643 F.2d 1043, 1047 (5th Cir. 1981); *United States v. US Stem Cell Clinic, LLC*, 403 F. Supp. 3d 1279, 1299-1300 (S.D. Fla. 2019).

### 3. <u>Elements of Receiving Misbranded Drugs in Interstate Commerce and Delivering or Proffering Them for Pay or Otherwise under 21 U.S.C. § 331(c)</u>

To prove that Defendants received misbranded drugs (or a component thereof) in interstate commerce and delivered or proffered them for pay or otherwise, the Government must show that: (1) the CSCTC product (specifically, the expanded SVF product) is a drug; (2) Defendants received the expanded SVF product, or a component thereof, in interstate commerce; (3) the expanded SVF product, or a component thereof, was misbranded when it was received by Defendants; and (4) the expanded SVF product was thereafter delivered or proffered for delivery for pay or otherwise.  21 U.S.C. § 331(c); *see also Fagan v. AmerisourceBergen Corp.*, 356 F. Supp. 2d 198, 214 (E.D.N.Y. 2004).

### C. The Government's Key Evidence in Support of Each Claim

#### 1. <u>The CSCTC Products are Drugs</u>

The FDCA defines a drug as any "article," or component thereof, that is "intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease" or is "intended to affect the structure or any function of the body of man or other animals."  *See* 21 U.S.C. § 321(g)(1)(B), (C), and (D).  The intended use of a product may be shown, *inter alia*, by how the product is promoted in its labeling and marketing.  21 C.F.R. § 201.128; *Action on Smoking & Health v. Harris*, 655 F.2d 236, 239 (D.C. Cir. 1980); *United States v. Lane Labs USA, Inc.*, 324 F. Supp. 2d 547, 566-67 (D.N.J. 2004), *order modified*, 328 F. Supp. 2d 520 (D.N.J. 2004), *aff'd*, 427 F.3d 219 (3d Cir. 2005); *see United States v. US Stem Cell Clinic, LLC*, 403 F. Supp. 3d at 1298-99.

Defendants promote the CSCTC products to the public for treating a wide range of

serious diseases and conditions in a variety of contexts.  Defendants intend the use of their products to address patients' symptoms of neurological, autoimmune, orthopedic, and degenerative medical conditions and/or diseases, including, but not limited to, cancer, arthritis, stroke, amyotrophic lateral sclerosis ("ALS"), multiple sclerosis ("MS"), macular degeneration, Parkinson's disease, and chronic obstructive pulmonary disease ("COPD"). Defendants' statements establishing the intended uses of the CSCTC products—and thus their status as "drugs"—include:

- A CSN website answers the question "Can stem cells treat cancer?" and explains that CSN is involved in "cutting edge clinical trials using stem cells to carry cancer-killing biologic agents deep into cancer tissue that has not responded to conventional therapy."

- A CSN website lists more than 30 diseases or conditions that CSN is "currently studying," including MS, ALS, cardiomyopathy, lupus, and macular degeneration.

- A CSCTC brochure entitled "Adipose Stem Cell Therapy and You" that was provided to prospective patients markets "a solution rich with your own stem cells" that "can be deployed to treat a number of degenerative conditions and diseases." The brochure notes that there have been "reports of improvements with MS, Muscular Dystrophy, Parkinson's, ALS, and stroke."

- A videotaped interview of Defendant Lander available to the public promotes the SVF product "for cancer therapies," arthritis, heart disease, lung disease and interstitial cystitis, and "brain conditions . . . . [by] injecting the cells directly into the brain."

Because Defendants' "intended use" of the CSCTC products is to treat, cure, and/or mitigate a variety of diseases and medical conditions, or to affect the structure or any function of the body, the CSCTC products are "drugs" under the FDCA and are subject to the FDCA's adulteration and misbranding provisions.  *See* 21 C.F.R. § 1271.20; Final Registration Rule, 66 Fed. Reg. 5449 and 5456 (Jan. 19, 2001).

### 2.   The CSCTC Products are Held for Sale After Shipment in Interstate Commerce

Courts have generally determined that a product is "held for sale" if it is used for

any purpose other than personal consumption.  *Regenerative Scis.*, 741 F.3d at 1320 (rejecting a narrow reading of 21 U.S.C. § 331(k), as at odds with "a statutory scheme designed to regulate the safety of drugs at every stage of their distribution"); *Evers*, 643 F.2d at 1050 ("A practicing physician may also fall within the bounds of this section. . . . Doctors holding drugs for use in their practice are clearly one part of the distribution process, and doctors may therefore hold drugs for sale within the meaning of [21 U.S.C. § 331(k)]."); *US Stem Cell Clinic*, 403 F. Supp. 3d at 1298 n.11.  The Ninth Circuit has clarified that a product used in treatment of a patient is "held for sale" as long as there is a commercial relationship between the doctor and the patient and the product is one that is meant to be "consumed" in the process.  *United States v. Kaplan*, 836 F.3d 1199, 1209 (9th Cir. 2016) (holding that a physician's use of a medical device on a patient is covered by the FDCA phrase "held for sale").  Defendants' CSCTC products are "held for sale" because Defendants market and offer their products to patients for commercial purposes other than Defendants' own personal consumption.

The CSCTC products are held for sale "after shipment in interstate commerce" because "the connection with interstate commerce required for jurisdiction" in "any action to enforce the requirements of [the FDCA] respecting a . . . drug . . . shall be presumed to exist."  21 U.S.C. § 379a; *see United States v. Chung's Prods. LP*, 941 F. Supp. 2d 770, 795 (S.D. Tex. 2013).  Moreover, the evidence will show that at least one component of the CSCTC products (*e.g.*, 0.9% Sodium Chloride Injection, USP) has traveled in interstate commerce.  The final drug product (here, the CSCTC products) need not have been shipped in interstate commerce in completed form to satisfy section 331(k)'s "after shipment in interstate commerce" requirement.  Rather "the 'shipment in interstate commerce' requirement is satisfied even when only an ingredient is transported interstate."  *Baker*, 932 F.2d at 814-15; *United States v. Dianovin Pharms., Inc.*, 475 F.2d 100, 103 (1st Cir. 1973); *Regenerative Scis.*, 741 F.3d at 1320-21; *US Stem Cell Clinic*, 403 F. Supp. 3d at 1298 n.11; *cf.* 21 U.S.C. § 321(g)(1)(D) (defining "drug" to include components of a drug for purposes of the FDCA).

6

Defendants' drugs contain multiple components shipped from other states. Components received from outside of California that Defendants use in the preparation and administration of the CSCTC products include 0.9% Sodium Chloride Injection, USP (*i.e.*, saline) and 5% Dextrose in Lactated Ringer's Injection, both of which originate outside the State. Defendants' manufacturing process also involves a collagenase-containing enzyme product made in Indiana. The Vaccinia Vaccine (also known as "ACAM2000") used to manufacture the SVF/Vaccinia product was shipped in interstate commerce from Georgia. And components of Defendants' expanded SVF product came from a firm in New Jersey.

### 3.   Evidence of Adulteration Supporting Violation of § 331(k)

FDA inspections revealed serious and obvious CGMP violations. The evidence will show that Defendants' CSCTC products are not manufactured, processed, packed, or held in compliance with CGMP and, thus, are adulterated. Specifically, the Court will hear from the FDA investigators (*i.e.*, Fred Lagud, Cynthia Jim, Michele Forster, and/or Darla Christopher) who inspected Defendants' facilities and will describe in detail the CGMP deficiencies that they observed. These witnesses—who collectively have decades of experience in evaluating facility design, operation, manufacturing, and testing procedures—will testify about Defendants' failure to aseptically process their drugs to prevent microbiological contamination or test the products for sterility and for the presence of endotoxins which can cause fevers and other health complications, as well as Defendants' failure to adequately investigate and/or report adverse events.

### 4.   Evidence of Misbranding Supporting Violation of § 331(k)

The CSCTC products are also misbranded because their labeling lacks "adequate directions for use" and the drugs are not entitled to any exemption from that requirement. 21 U.S.C. § 352(f)(1). Various FDA expert witnesses (*i.e.*, Drs. Carolyn Yong and Larissa Lapteva) will describe the evidence establishing that the CSCTC products are drugs and evidence establishing that their labeling is deficient. First, the CSCTC products do not bear labeling that contains adequate directions for how to use them, as required by 21

7

C.F.R. § 201.5.  Second, the CSCTC drug products are unapproved prescription drugs that are not excepted from labeling regulations requiring directions under which a lay person can use the drug safely.  Third, it is currently impossible to draft adequate directions for use because there is no scientifically valid evidence to show that the CSCTC products are safe or effective for any indication.

Defendants' CSCTC products are also misbranded under 21 U.S.C. § 353(b)(4) because they are prescription drugs and their labels fail to bear the "Rx Only" symbol.  Testimony will also explain why Defendants' SVF/Vaccinia product—which Defendants have used to purportedly treat cancer patients—is "dangerous to the public health at large if used as recommended by its vendors," *see United States v. 62 Packages, More or Less, of Marmola Prescription Tablets*, 142 F.2d 107, 110 (7th Cir. 1944), and is therefore misbranded under 21 U.S.C. § 352(j).

## 5.   Evidence that Defendants Received Misbranded Drugs in Interstate Commerce and Delivered Them for Pay or Otherwise under § 331(c)

Defendants' expanded SVF product is a drug made from a component—namely, expanded cells—that they receive from a firm outside of California.  The evidence will show that the expanded SVF product is misbranded because it lacks adequate directions for use, *supra*, and that Defendants deliver the expanded SVF product to their patients who pay them for their services.

## D.   Defendants' "Lack of Adequate Notice" Defense

Defendants' sole affirmative defense suggests that the Government's case is based on an alleged "new interpretation" of the SSP exception set forth at 21 C.F.R. § 1271.15(b) that they consider "arbitrary and capricious."[2]  *See* Defs.' Contentions, ECF No. 108 at

---

[2] To the extent Defendants are claiming that this case violates the Administrative Procedure Act ("APA"), Defendants did not bring an APA case, or even file a counterclaim regarding FDA's allegedly "arbitrary and capricious" actions here.  Furthermore, the APA is not a defense, but is an independent cause of action where, under circumstances not present here, a reviewing court may "hold unlawful and set aside agency action" found to be arbitrary and capricious.  *See* 5 U.S.C. §§ 704, 706(2); *Bennett v. Spear*, 520 U.S. 154, 176-77 (1997); *Fla. Power & Light Co. v. Lorion*, 470

8

13-14.  This argument lacks merit.  Even if inadequate notice were an affirmative defense to selling adulterated and misbranded drugs that pose a risk to public health—which it is not—Defendants had years of notice that the SSP exception would not apply to their products.[3]

### E.    No Third Parties

There are no third parties in this action.

## II.    EVIDENTIARY ISSUES [Local Rule 16-4.1(h)]

On July 17, 2020, the Court denied all pending motions in *limine* without hearing argument.  The Government anticipates that these and other evidentiary issues will arise during the course of the trial when certain exhibits or testimony are offered, and that these can be addressed at that time.

## III.    ISSUES OF LAW [Local Rule 16-4.1(i)]

The legal issues likely to be contested, as presently known to the Government, are as follows:

### A.    Defendants' CSCTC products are subject to the FDCA and its implementing regulations as drugs.

1. Defendants' CSCTC products and their components are "drugs" within the meaning of the FDCA, 21 U.S.C. § 321(g)(1)(B), (C), and (D) and relevant regulations, 21 C.F.R. § 201.128, because Defendants' records, public statements, and information contained on Defendants' websites and elsewhere establish that the CSCTC products are intended to be used in the cure, mitigation, or treatment of diseases in man and/or to affect the structure or function of the body.

2. Defendants' CSCTC products are "prescription drugs" within the meaning of the FDCA, 21 U.S.C. § 353(b)(1)(A), because due to their

---

U.S. 729, 743-44 (1985); *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 419 (1971).

[3] The applicability of the SSP exception to Defendants' manufacture of the CSCTC products is discussed in more detail in section VIII of this trial brief, *infra*.

toxicity or other potentiality for harmful effect, or the method of their use, or the collateral measures necessary to their use, they are not safe for use except under the supervision of a practitioner licensed by law to administer such drug.

3. Defendants' CSCTC products are "new drugs" within the meaning of the FDCA because they are not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in their labeling (21 U.S.C. § 321(p)(1)), or because they have not been used to a material extent or for a material time under the conditions prescribed, recommended, or suggested in their labeling (21 U.S.C. § 321(p)(2)).

**B.   Defendants' CSCTC products also are subject to the PHSA and its implementing Part 1271 regulations as biological products and HCT/Ps.**

1. Defendants' CSCTC products are "biological products" within the meaning of the Public Health Service Act ("PHSA"), 42 U.S.C. § 262(i).

2. Defendants' CSCTC products are "human cells, tissues, or cellular or tissue-based products" ("HCT/Ps"), defined as "articles containing or consisting of human cells or tissues that are intended for implantation, transplantation, infusion, or transfer into a human recipient," 21 C.F.R. § 1271.3(d).

3. Defendants' CSCTC products do not meet all of the criteria in 21 C.F.R. § 1271.10(a) for regulation solely under the PHSA and 21 C.F.R. Part 1271:[4]

---

[4] Defendants have the burden of establishing that each of the SVF, SVF/Vaccinia, and expanded SVF products meets all four regulatory criteria in 21 C.F.R. § 1271.10(a).  *See* 21 C.F.R. § 1271.10(a); *United States v. First City Nat'l Bank of Houston*, 386 U.S. 361, 366 (1967) (defendants

10

       a.  Defendants' CSCTC products are not "minimally manipulated" within the meaning 21 C.F.R. § 1271.10(a)(1) and § 1271.3(f);

       b.  Defendants' CSCTC products are not "intended for homologous use only" within the meaning of 21 C.F.R. § 1271.10(a)(2) and § 1271.3(c);

       c.  The manufacture of Defendants' SVF/Vaccinia product involves the combination of an HCT/P with "another article" within the meaning of 21 C.F.R. §1271.10(a)(3).

4.  Defendants' establishments do not qualify for any of the regulatory exceptions in 21 C.F.R. § 1271.15, including the same surgical procedure exception in 1271.15(b):[5]

       a.  Defendants remove an HCT/P, adipose tissue, from their patients and return a different HCT/P, cells derived from that tissue;

       b.  In manufacturing the CSCTC products for their patients, Defendants do not *implant* the HCT/P, in this case, adipose tissue, that was *removed* from their patients;[6]

5.  Part 1271 of Title 21 of the Code of Federal Regulations is not ambiguous. But even if it is, FDA's interpretation is entitled to deference because "the character and context of the agency interpretation entitles it to controlling weight." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2416 (2019) (explaining that

---

bear the burden of showing § 1271.10 exception applies); *Fed. Trade Comm'n v. Morton Salt Co.*, 334 U.S. 37, 44-45 (1948); *Harry C. Crooker & Sons v. Occupational Safety and Health Review Comm'n*, 537 F.3d 79, 85 (1st Cir. 2008). Defendants have not met and cannot meet their burden.

[5] Defendants have the burden of establishing that the § 1271.15(b) exception to "the requirements of [21 C.F.R. Part 1271]" applies here. *See* 21 C.F.R. § 1271.15(b); *Regenerative Scis.*, 741 F.3d at 1322 (citing *First City Nat'l Bank of Houston*, 386 U.S. at 366 (1967)); *Morton Salt Co.*, 334 U.S. at 44-45; *Harry C. Crooker & Sons*, 537 F.3d at 85. Defendants have not met and cannot meet their burden.

[6] The Court instructed the Government to present evidence regarding "whether the SVF Procedure alters the SVF cells" at trial. *See* ECF No. 84 at 13. Even if the Court were to find that the SVF cells (*i.e.*, not adipose tissue) are the relevant "HCT/P," for purposes of its section 1271.15(b) analysis, Defendants still do not implant "such HCT/P" that was removed from their patients because the SVF cells ultimately returned to the patient have been altered during processing.

courts must look to whether the agency's position represents the agency's actual view, reflects its "fair and considered judgment," is not merely an "ad hoc" statement, does not create "unfair surprise," and implicates the agency's substantive expertise).

**C.  Defendants' CSCTC products are adulterated and misbranded drugs in violation of the FDCA.**

1. The CSCTC products are drugs and biological products under the FDCA and section 351 of the PHSA, 42 U.S.C. § 262, respectively, and they are subject to the provisions of both statutes, including the FDCA's adulteration, misbranding, and premarket approval provisions.  21 C.F.R. § 1271.20.

2. Because Defendants do not manufacture the CSCTC products in a manner that conforms to CGMP, the Defendants' CSCTC products are adulterated within the meaning of the FDCA, 21 U.S.C. § 351(a)(2)(B).

3. Defendants' CSCTC products are misbranded within the meaning of the FDCA, 21 U.S.C. § 352(f)(1), because they are drugs and their labeling fails to bear adequate directions for use, and because they are not exempt from the requirements of 21 U.S.C. §352(f)(1).

4. Defendants' CSCTC products are misbranded within the meaning of the FDCA, 21 U.S.C. §353(b)(4), because they are prescription drugs and, at times prior to dispensing, their labels fail to bear, at minimum, the symbol "Rx only".

5. Defendants' SVF/Vaccinia product is misbranded within the meaning of the FDCA, 21 U.S.C. § 352(j), because it is dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof.

6. Defendants violate 21 U.S.C. § 331(k) by causing the adulteration of CSCTC products within the meaning of 21 U.S.C. § 351(a)(2)(B), while

they are held for sale after shipment of one or more of their components in interstate commerce.

7. Defendants violate 21 U.S.C. § 331(k) by causing the misbranding of CSCTC products within the meaning of 21 U.S.C. §§ 352(f)(1), 352(j), and 353(b)(4), while they are held for sale after shipment of one or more of their components in interstate commerce.

8. Defendants CSCTC, Berman, and Lander violate 21 U.S.C. § 331(c) by receiving drugs that are misbranded within the meaning of 21 U.S.C. §§ 352(f)(1) and 353(b)(4) in interstate commerce and delivering them or proffering them for delivery for pay or otherwise.

**D. Defendants should be enjoined from further violations of the FDCA.**

1. The Court has jurisdiction under 21 U.S.C. § 332(a) to enjoin Defendants' violations of the FDCA.

2. Based on Defendants' repeated past violations, there is a reasonable expectation that Defendants will continue to violate the FDCA in the future if not enjoined.

3. The Government is entitled to a statutory injunction against Defendants' repeated violations of 21 U.S.C. § 331(k), by causing the adulteration and misbranding of drugs while holding them for sale after shipment of one or more of their components in interstate commerce, and of 21 U.S.C. § 331(c), by receiving misbranded drugs in interstate commerce and delivering or proffering for delivery such drugs for pay or otherwise.

## IV.   BIFURCATION OF ISSUES [Local Rule 16-4.3]

The Government does not seek bifurcation of any issues.  At trial, the Government will present evidence and argument concerning all issues alleged in the Complaint.  As the Court previously noted, this case concerns alleged violations of the FDCA on which the Court "made no ultimate findings of fact" on summary judgment.  *See* ECF No. 102 at 1. Accordingly, the Government will produce evidence at trial to establish any elements

13

where it carries the burden.  *Id.* at 2.

## V.   TRIAL [Local Rule 16-4.4]

The Government seeks a statutory injunction against Defendants' adulteration and misbranding in violation of the FDCA, as prohibited by sections 331(c) and (k) of title 21. *See* 21 U.S.C. § 332(a) ("The district courts of the United States . . . shall have jurisdiction . . . to restrain violations of section 331").  The matter is set for a bench trial on May 4, 2021.

## VI.   ATTORNEY'S FEES [Local Rule 16-4.5]

The Government does not seek attorney's fees in this case, nor are Defendants entitled to recover the same.

## VII.   ABANDONMENT OF ISSUES [Local Rule 16-4.6]

The Government has not abandoned any issues in the pleadings.  Defendants have abandoned all of the affirmative defenses previously raised in their pleadings.  Defendants' Contentions untimely raised a single new affirmative defense—*i.e.*, a purported "lack of adequate notice"—which the Court should not consider, as discussed in section I.D. above.

## VIII.   REPLY TO DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW [Local Rule 16-10]

Defendants' Memorandum of Contentions of Fact and Law (ECF No. 108) presents a variety of arguments that will likely be raised at trial.  Their positions lack factual and legal support, however, and should not prevent the Court from enjoining the Defendants from continuing to violate the FDCA.

### A.   The FDCA Applies to Defendants and Their Products

Defendants claim that the FDCA does not apply to them because they are "simply physicians who are practicing medicine and performing surgery."  *See* Defs.' Contentions at 24-25.  But even doctors must comply with FDCA requirements.  The FDCA "enacts a comprehensive uniform regulatory scheme for the distribution of drugs."  *Regenerative Scis.*, 741 F.3d at 1319-20.  Congress did not create a broad "practice of medicine" exception that allows physicians to do whatever they please.  *Id.*  "[W]hile the [FDCA]

14

1    was not intended to regulate the practice of medicine, it was obviously intended to control
2    the availability of drugs for prescribing by physicians." *Evers*, 643 F.2d at 1048; *see also*
3    *US Stem Cell Clinic*, 403 F. Supp. 3d at 1300 n.12.

4         Although Defendants claim they merely engage in "off-label uses" of medical
5    products, *see* Defs.' Contentions, ECF No. 108 at 25, that argument fails because, as
6    Defendants admit, the CSCTC products have not been approved by FDA for *any* use.  *See*
7    *Regenerative Scis*, 741 F.3d at 1324-25 (stem cell "Mixture" that was not approved by
8    FDA for any purpose is a misbranded drug even if prescribed by appellant doctors).
9    Moreover, the Ninth Circuit has noted that "off-label use does not immunize a physician
10   who uses adulterated products." *Kaplan*, 836 F.3d at 1211.  Although "off-label use allows
11   physicians to prescribe *lawful* drugs for unapproved uses, off-label use of *adulterated*
12   products is beyond the scope of the privilege."  *Id.* (citing *Evers*, 643 F.2d at 1049)
13   (emphasis added) (internal quotations omitted).

14        Defendants also contend that their CSCTC products cannot be "drugs" because they
15   supposedly are "unlike traditionally manufactured pharmaceutical drugs."   Defs.'
16   Contentions, ECF No. 108 at 26.  Whether a product subjectively resembles so-called
17   "traditional" drugs is irrelevant.  *See Med. Ctr. Pharmacy v. Mukasey*, 536 F.3d 383, 395
18   (5th Cir. 2008); *see also United States v. Loran Med. Sys.*, 25 F. Supp. 2d 1082, 1086-87
19   (C.D. Cal. 1997) (holding that defendants' cellular product for the treatment of diabetes
20   was both a biological product and a new drug subject to FDA's regulatory authority under
21   the PHSA and FDCA).  The broad statutory definition, 21 U.S.C. § 321(g)(1)(B) & (C),
22   and decades of case law hold that the intended use of a product makes it a drug.  *See, e.g.*,
23   *Whitaker v. Thompson*, 353 F.3d 947, 953 (D.C. Cir. 2004) (classification as a "drug"
24   under the FDCA "turns on the nature of the claims advanced on its behalf"); 21 C.F.R.
25   § 201.128.  Defendants intend their products be used to treat cancer, arthritis, COPD,
26   stroke, and other diseases and conditions.  With these intended uses, the CSCTC products
27   are drugs—just like the stem cell products in *Regenerative Sciences* and *US Stem Cell*
28   *Clinic*.

1        There is also no question that Defendants "manufacture" the CSCTC products.

2   "Manufacture means, but is not limited to, any or all steps in the recovery, processing,

3   storage, labeling, packaging, or distribution of any human cell or tissue, and the screening

4   or testing of the cell or tissue donor." 21 C.F.R. § 1271.3(e). Because SVF does not occur

5   naturally in the body,[7] Defendants employ numerous processing steps to derive SVF from

6   adipose tissue they remove from patients. *See* Ans., ECF No. 27, ¶¶ 5, 9, 10. Their efforts

7   alter the physical properties of the removed adipose tissue and result in a liquified mixture

8   of cells and cell debris that is missing the extracellular matrix and adipocytes found in

9   adipose tissue. *See* 21 C.F.R. § 1271.3(e).

**B.   Defendants' Establishments Do Not Qualify for the "Same Surgical Procedure Exception" to the Requirements of 21 C.F.R. Part 1271.**

12        Defendants erroneously contend that they qualify for the SSP exception, which

13   applies to certain human cells, tissues, or cellular or tissue-based products ("HCT/Ps")

14   regulated under the Public Health Service Act, 42 U.S.C. § 262(i) and implementing

15   regulations in 21 C.F.R. Part 1271, which are separate and apart from the FDCA. The Part

16   1271 regulations create an electronic registration and listing system for certain

17   establishments that manufacture HCT/P's and establish donor-eligibility, current good

18   tissue practice requirements, and other procedures to prevent the introduction,

19   transmission, and spread of communicable diseases by HCT/P's. *See* 21 C.F.R.

20   § 1271.1(a). Part 1271 regulations recognize that HCTP's are subject to one of two tiers

21   of FDA regulation based on the risk they pose to public health:

     • (1) HCT/P's (such as Defendants' CSCTC products) that are regulated as

       drugs and biological products under the FDCA and PHSA that are subject to

---

[7] Defendants erroneously claim that SVF is "naturally occurring" in the body. *See, e.g.*, ECF No. 124 at 11, Defs.' Proposed Finding of Fact 42. It is not. Although the cells comprising SVF are isolated from adipose tissue, the Government's expert (*i.e.*, Dr. Carolyn Yong) will explain that SVF is not readily available for removal from an individual and merely refers to a liquified mixture of cells and cell debris obtained through Defendants' processing of adipose tissue.

1    premarket approval requirements as well as various regulatory requirements

2    (such as CGMP, Part 1271 regulations, etc.).  *See id.* § 1271.1(c); *see also id.*

3    § 1271.20.

4    - (2) HCT/P's that are regulated solely under section 361 of the PHSA, 42

5      U.S.C. § 264, and the Part 1271 regulations as described in 21 C.F.R.

6      § 1271.10.  *See id.* § 1271.1(b).

7    Part 1271 regulations also identify five types of establishments that are excepted

8    from complying with all Part 1271 requirements, namely:

9    - (1) establishments that use HCT/P's solely for nonclinical scientific or

10     educational purposes;

11   - (2) carriers that accept, receive, carry, or deliver HCT/P's in the usual course

12     of business as a carrier;

13   - (3) establishments that only recover reproductive cells or tissue and

14     immediately transfer them into a sexually intimate partner of the cell or tissue

15     donor;

16   - (4) establishments that do not recover, screen, test, process, label, package,

17     or distribute, but only receive or store HCT/P's solely for implantation,

18     transplantation, infusion, or transfer within their facility; and

19   - (5) establishments that remove HCT/P's from an individual and implant *such*

20     HCT/P's into the same individual during the same surgical procedure.  *See*

21     21 C.F.R. § 1271.15(a)-(e) (emphasis added).

22   None of these narrow exceptions apply to Defendants' establishments.

23   Defendants' CSCTC products are drugs subject to the FDCA.  Although Defendants

24   assert that their violations of the FDCA are acceptable under the SSP exception, their

25   arguments are unavailing.  The SSP exception provides:

26   You are not required to comply with the requirements of [21 C.F.R. Part

27

28

1271] if you are an establishment that removes HCT/P's[8] from an individual and implants *such HCT/P's* into the same individual during the same surgical procedure.

21 C.F.R. § 1271.15(b) (emphasis added).

Defendants' establishments do not qualify for the SSP exception because Defendants remove from patients one HCT/P—*i.e.*, adipose tissue—and following processing implant a different HCT/P, *i.e.*, a cellular product containing SVF. Defendants' manufacturing process fundamentally alters the adipose tissue that they removed from the patient,[9] and further alters the physical and biological characteristics of the cells originally contained in the tissue.[10] In short, "such HCT/P" is not being implanted.

"[S]uch HCT/P's" means HCT/P's in the form removed from the body. *US Stem Cell Clinic*, 403 F. Supp. 3d at 1288-89 (emphasis added) (finding "the text of § 1271.15(b) unambiguously supports the FDA's interpretation that 'such HCT/P's' refers to the antecedent HCT/P removed from the patient in its original form."). The SSP exception may apply to establishments where adipose tissue is removed from a patient, and "such" adipose tissue is then returned to the same patient in the same surgical procedure. For example, where a surgeon removes adipose tissue from one part of a patient's body and returns the tissue to another part of the patient's body for reconstructive purposes (*i.e.*, for facial or breast augmentation). But it does not apply where, as here, adipose tissue is removed from a patient, the tissue is enzymatically digested to destroy its

---

[8] "HCT/P" distinguishes between tissues and cells and is defined as "articles containing or consisting of human cells or tissues that are intended for implantation, transplantation, infusion, or transfer into a human recipient," 21 C.F.R. § 1271.3(d).

[9] Adipose tissue contains adipocytes and an extracellular matrix that gives the tissue structure. Defendants remove adipose tissue and subject it to extensive chemical and mechanical processing. Defendants then administer to patients a solution made up of free-floating cells and cell debris, drug components such as saline or ringer's injection, and any processing components left behind from the destruction of the adipose tissue. The text of the SSP exception does not contemplate this kind of transformation of the HCT/P removed.

[10] Pursuant to the Court's instruction, the Government will present evidence regarding "whether the SVF Procedure alters the SVF cells" at trial. *See* n.7, *supra*.

18

structural components, and then centrifuged and filtered to isolate a collection of free-floating cells and cell debris which (unlike adipose tissue) does not contain adipocytes or an extracellular matrix.

Defendants claim the SSP exception applies because they allegedly return certain adipose-derived cells back into the patient's body. However, Defendants overlook the changes effected by their extensive chemical and mechanical processing of the adipose tissue they removed. In addition to violating the rules of statutory construction by rendering meaningless the word "such,"[11] Defendants' selective application of the SSP exception would swallow the rule, with serious public health consequences here and in future cases.[12] For example, Defendants' interpretation of the SSP exception would allow an establishment to remove any tissue from any part of a patient, perform any number and type of manufacturing steps on that tissue in relation to any purported surgical procedure (regardless of the public health risk associated with any of those steps), inject the end product into any part of the patient, and then invoke the SSP exception as long as the end product contained one or more cells that were present in the original tissue—no matter how wildly different the end product might be. But Defendants are wrong, as the phrase "*such* HCT/P" in the SSP exception does not mean "*any* HCT/P."

Defendants' claim that they were unfairly surprised by the Government's assertion that their establishments do not qualify for the SSP exception is both unreasonable and unfounded. The FDA regulations, FDA guidance, and recent court cases involving very

---

[11] *See, e.g., United States v. Bowen*, 100 U.S. (10 Otto) 508, 513 (1879) (reading the statutory phrase "all such pensioners" to refer to the subset of pensioners previously referenced in the statutory text, since construing the phase otherwise would treat the word "such" as surplusage).

[12] The Government construes the phrase "such HCT/Ps" consistent with the plain language, the structure and regulatory history of Part 1271, and Congressional and regulatory intent, as courts must. *See Kisor*, 139 S. Ct. at 2415-16 (requiring courts to exhaust all traditional tools of construction before concluding that a rule is ambiguous). But even if this Court were to find the phrase ambiguous, FDA's interpretation should be accorded substantial deference because its interpretation "necessarily require[s] significant expertise and entail[s] the exercise of judgment grounded in policy concerns." *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994), *quoting Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 697 (1991*); see also United States v. Regenerative Scis., LLC*, 878 F. Supp. 2d 248, 258 (D.D.C. 2012*); Kisor*, 139 S. Ct. at 2417-19.

similar products all set out a consistent position.  Moreover, Defendants' past statements and conduct confirm that they were personally aware that the SSP exception would not apply to their CSCTC products.

Consistent with the final text, the regulatory history has made clear since at least 1997 that "[c]ells and tissues that were manipulated extensively, combined with non-tissue components, or were to be used for other than their normal functions would be regulated as biologics or devices requiring premarket approval by FDA."  *See* FDA, *Proposed Approach to Regulation of Cellular and Tissue-Based Products* (Feb. 28, 1997), FDA Dkt. No. 97N-0068, available at https://www.fda.gov/media/70704/download, announced at 62 Fed. Reg. 9721 (Mar. 4, 1997) (last accessed: Apr. 26, 2021) ("1997 Proposed Approach"); *see also US Stem Cell Clinic*, 403 F. Supp. 3d at 1291.  When FDA was considering the creation of the SSP exception in its Proposed Rule, the agency made clear that the exception would be very narrow: "For example, a surgeon might remove a saphenous vein from a patient for use in a later coronary bypass in the same patient. Registration and listing would not be required unless the saphenous vein was stored with other cellular or tissue-based products."  *See* Proposed Rule Concerning "Establishment Registration and Listing for Manufacturers of Human Cellular and Tissue-Based Products," 63 Fed. Reg. 26744, 26748 (May 14, 1998) ("1998 Proposed Rule"); *see US Stem Cell Clinic*, 403 F. Supp. 2d at 1291.

In 2001, the Final Rule codifying the SSP exception reemphasized that it would apply only in very limited circumstances.  The preamble to the Final Rule stated that "hospitals that store autologous cells or tissues for subsequent application in the same patient" would qualify for the SSP exception "so long as the hospital does not engage *in any other activity encompassed within the definition of manufacture*"[13] such as "expand[ing] the cells or tissues."  *See* Final Rule Concerning Human Cells, Tissues, and

---

[13] *See* 21 C.F.R. § 1271.3(e) (broadly defining "manufacture" to include, in relevant part and without limitation, "any or all steps in the recovery, processing, storage, labeling, packing, or distribution of any cell or tissue").

1   Cellular and Tissue-Based Products; Establishment Registration and Listing ("2001 Final
2   Rule"), 66 Fed. Reg. 5447, 5460 (emphasis added); *US Stem Cell Clinic*, 403 F. Supp. 3d
3   at 1291-93.  Thus, the plain text of the SSP exception and its regulatory history make clear
4   that the exception applies and was intended to apply in limited circumstances where an
5   HCT/P was removed from a patient, and such HCT/P thereafter was returned to the same
6   patient, without intervening manufacturing steps.

7        While not in themselves binding, FDA's 2014 and 2017 guidances reiterated the
8   agency's longstanding view of the exception's very limited application.  In its 2014 Draft
9   Guidance,[14] FDA included illustrative examples of HCT/P's used in surgical procedures
10  that would be entitled to the SSP exception, including "autologous skin grafting and
11  coronary artery bypass surgery involving autologous vein or artery grafting."  *See* 2014
12  Draft Guidance at 4.  FDA also reaffirmed that an establishment that processes an HCT/P
13  after removal and prior to implantation generally would not qualify for the exception.  *Id.*
14  at 5.  FDA's Final Guidance,[15] issued in 2017, confirmed yet again that an establishment
15  that processes an autologous HCT/P after removal and prior to implantation generally
16  would not qualify for the SSP exception.  *Id.* at 7.  The Final Guidance reiterated the
17  exception's narrow reach and noted that for the SSP exception to apply, the HCT/Ps
18  removed from the patient must "remain 'such HCT/Ps;' they are in their original form."
19  *See* 2017 Final Guidance at 4; *accord* 2014 Draft Guidance at 3.  The Final Guidance
20  noted that "[g]enerally, the only processing steps that will allow an HCT/P to remain 'such
21  HCT/P' are rinsing, cleansing, sizing, and shaping."  2017 Final Guidance at 5.

22       Defendants understood the SSP exception and its limitations.  Defendant Lander

---

[14] *Same Surgical Procedure Exception under 21 CFR 1271.15(b): Questions and Answers Regarding the Scope of the Exception, Draft Guidance for Industry* (Oct. 2014), https://web.archive.org/web/20170404000725/https://www.fda.gov/downloads/BiologicsBloodVaccines/GuidanceComplianceRegulatoryInformation/Guidances/Tissue/UCM419926.pdf ("2014 Draft Guidance").

[15] *Same Surgical Procedure Exception under 21 CFR 1271.15(b): Questions and Answers Regarding the Scope of the Exception, Guidance for Industry* (Nov. 2017), https://www.fda.gov/media/89920/download ("2017 Final Guidance").

21

spoke at an FDA public hearing to solicit comments about the 2014 Draft Guidance and must have known what that document said.[16]  *See* 81 Fed. Reg. 23661 (April 22, 2016). Defendants later attempted unsuccessfully to obtain FDA drug approvals for CSCTC products at issue in this litigation.  Thus, Defendants cannot plausibly claim that they are now unfairly surprised by the regulatory text and the narrow circumstances to which it applies.  Nor can they credibly claim that FDA, in its Final Guidance or elsewhere, somehow reversed its position to Defendants' detriment.  Indeed, had FDA ever suggested that the SSP exception *did* apply to the type of extensive processing at issue here, *that* truly would have been a "substantive change[]" in FDA's interpretation.  *Contra* ECF No. 124 at 7, Defs.' Proposed Finding of Fact 13.  But FDA has never suggested the regulatory text means anything other than what it says.

### C.   This Enforcement Action Satisfies the Constitution and the FDCA's Interstate Commerce Requirement.

As discussed above in section I.C.2, Defendants' CSCTC products are "held for sale after shipment in interstate commerce" within the meaning of the FDCA.  Yet Defendants contend that the interstate commerce nexus is not satisfied because only the SVF component of the CSCTC products is relevant, and the SVF is not shipped in interstate commerce after being isolated from adipose tissue.  *See* Defs.' Contentions, ECF No. 108 at 22.  This contention conflicts with both the plain language of the statute and decades of case law.

Both the constitutional and statutory requirements for interstate commerce are satisfied here, as Defendants manufacture their CSCTC products using components shipped in interstate commerce, including 0.9% Sodium Chloride Injection, USP (*i.e.*, saline) from outside of California.  The FDCA defines "drug" to include components of a drug, 21 U.S.C § 321(g)(1)(D), and courts consistently have interpreted sections 331(k)

---

[16] *See* Tr. of "Part 15 Hearing: Draft Guidances Relating to the Regulation of Human Cells, Tissues, or Cellular or Tissue-based Products" at 148-153 (Sept. 12, 2016), available at https://www.fda.gov/downloads/BiologicsBloodVaccines/NewsEvents/WorkshopsMeetingsConferences/UCM532350.pdf (last accessed: Apr. 26, 2021).

22

and 321(g)(1)(D) to mean that not every drug ingredient has to be transported interstate to establish a violation of section 331(k). *See, e.g.*, *Baker*, 932 F.2d at 814-15 ("the 'shipment in interstate commerce' requirement is satisfied even when only an ingredient is transported interstate"); *Regenerative Scis.*, 741 F.3d at 1320. Section 321(g)(1)(D)'s reference to "component" is not restricted and includes more than just the drug's active ingredient or ingredients. Moreover, FDA regulations define "component" broadly to mean "*any* ingredient intended for use in the manufacture of a drug product, including those that may not appear in such drug product." *See* 21 C.F.R. § 210.3(b)(3) (emphasis added).[17]

The Court should also reject Defendants' argument that applying the FDCA violates the Commerce Clause because Defendants perform their purported procedures within the state of California. Even if the inquiry were limited only to particular procedures, the Supreme Court has confirmed Congress's authority to regulate "even purely local activities that are part of an economic class of activities that have substantial effect on interstate commerce." *Gonzales v. Raich*, 545 U.S. 1, 17 (2005) (internal quotations and citations omitted). When the D.C. Circuit confronted this very issue in *Regenerative Sciences*, it found that even where the purported medical procedure "occur[ed] entirely within the state," the cellular product nonetheless had "sufficient connection to interstate commerce to permit federal regulation under the Commerce Clause." *Regenerative Scis.*, 741 F.3d at 1314, 1320.

Finally, Defendants suggest without basis that the Government may not pursue this enforcement action because Defendants' patients have a constitutional right to control their tissues and cells. But there is no constitutional right to receive unapproved drugs. *See United States v. Rutherford*, 442 U.S. 544, 552 (1979) (terminally ill patients do not have a constitutional right to obtain the unapproved drug Laetrile); *Abigail All. for Better*

---

[17] Thus, the Government would satisfy the interstate commerce requirement of § 331(k) even under Defendants' inapt interpretation because the collagenase-containing enzyme product that is essential to their processing of the CSCTC products was obtained from a source outside of California.

23

*Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 711 (D.C. Cir. 2007) (terminally ill patients have no constitutional right to unapproved experimental drugs).

### D.   Injunctive Relief with respect to Defendants' SVF/Vaccinia and Expanded SVF Products is Necessary and Appropriate

Defendants suggest that injunctive relief is inappropriate with respect to their SVF/Vaccinia and expanded SVF products, because they are currently not making those products and claim they have "no intention" of manufacturing them again.  *See* ECF No. 124-1, Defs.' Proposed Conclusions of Law at 42-43.  However, the "the court's power to grant injunctive relief survives discontinuance of the illegal conduct."  *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953); *see also United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 176 (9th Cir. 1987).  "[M]ere cessation of violative activities is not, of itself, grounds for denial of a statutory injunction sought to protect the public health.  This is particularly true where such cessation arises only as a result of . . . threatened litigation."  *United States v. Sene X Eleemosynary Corp. Inc.*, 479 F. Supp. 970, 981 (S.D. Fla. 1979) (internal citation omitted).

In analyzing whether an injunction is appropriate after a defendant claims to have voluntarily ceased the illegal behavior, a court should consider "the bona fides of the expressed intent to comply, the effectiveness of the discontinuance and, in some cases, the character of the past violations."  *W.T. Grant Co.*, 345 U.S. at 633; *United States v. Bob Lawrence Realty, Inc.*, 474 F.2d 115, 126 (5th Cir 1973) (citing these *W.T. Grant* factors).  Applying the *W.T. Grant* factors here, the cognizable danger of future violations is clear.

Defendants have a history of manufacturing and administering unapproved drugs that could inflict serious harm on the public; that history suggests that if not enjoined, Defendants would continue to pursue such activities.   For example, Defendants' SVF/Vaccinia product combined SVF with ACAM2000—a smallpox vaccine containing live virus—and injected that unapproved product in late-stage cancer patients.  If the Government had not acted to limit Defendants' access to the smallpox vaccine by

24

executing a civil seizure action[18] and initiating this case, Defendants would have continued their human experimentation.  Similarly, Defendants did not stop manufacturing and administering their expanded SVF product until FDA sent a Warning Letter to Defendants' third-party contract manufacturer[19] and initiated this case.

Given this background, Defendants' claim that they have no interest in manufacturing these unapproved products cannot be taken at face value and provides no guarantee that they will stop experimenting with SVF and other unapproved, potentially dangerous drugs in the future.  The only way to ensure Defendants comply with the FDCA is to issue an injunction regarding the full range of Defendants' SVF-related products. Excluding two of the three products from the scope of the injunction—as Defendants advocate—would create an enormous loophole to exploit at their patients' expense and incentivize resumption of the same illegal practices that led to the initiation of this case. Indeed, Defendants' continuing denial that their SVF products are drugs and refusal to stop distributing adulterated and misbranded drugs in the absence of government intervention only reinforces the need for permanent injunctive relief.  *See W.T. Grant*, 345 U.S. at 633.

Dated: April 27, 2021

Respectfully Submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

GUSTAV W. EYLER
Director
Consumer Protection Branch

---

[18] *See United States v. Five Articles of Drug, ACAM2000, Vaccinia Vaccine, Live*, 2018 WL 6318834 (C.D. Cal Jan. 30, 2018).

[19] *See* "Warning Letter [to] American CryoStem Corporation" (Jan. 03, 2018), available at https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/american-cryostem-corporation-535041-01032018 (last accessed: Apr. 26, 2021).

1

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*/s/   Natalie N. Sanders*
NATALIE N. SANDERS
ROGER J. GURAL
Consumer Protection Branch
U.S. Department of Justice
450 5th Street, NW, Suite 6400-South
Washington, D.C. 20530
Telephone: (202) 598-2208
Facsimile:  (202) 514-8742
E-mail: Natalie.N.Sanders@usdoj.gov

*Counsel for United States of America*

Of Counsel:

DANIEL J. BERRY
Acting General Counsel
Department of Health and Human Services

PERHAM GORJI
Deputy Chief Counsel for Litigation

MICHAEL SHANE
MICHAEL HELBING
Associate Chief Counsel for Enforcement
United States Food and Drug Administration
Office of the Chief Counsel
White Oak 31, Room 4554
10903 New Hampshire Avenue
Silver Spring, MD 20993-0002
Telephone: 301-796-8593

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 27th day of April 2021, I electronically filed a true and correct copy of the foregoing PLAINTIFF'S TRIAL BRIEF through the Court's CM/ECF system, which will send a notice of electronic filing to the following counsel of record listed below:

Celeste M. Brecht
Ramanda R. Luper
JONES DAY

Thomasina E. Poirot
Matthew M. Gurvitz
Nicole N. King
Witt W. Chang
VENABLE LLP


*/s/ Natalie N. Sanders*
NATALIE N. SANDERS